UNITED STATES of America, Appellee,

v.

Hipolito CRUZ PAGAN et al.,
Defendants, Appellants.

Nos. 75–1312 to 75–1314.

United States Court of Appeals,
First Circuit.

Argued Feb. 9, 1976.

Decided June 10, 1976.

Gino P. Negretti, Miami, Fla., for appellants.

Jose A. Quiles, Asst. U. S. Atty., San Juan, P. R., with whom Julio Morales Sanchez, U. S. Atty., San Juan, P. R., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

After a jury trial each of the appellants was found guilty as charged[1] in the multiple-count indictment.[2] Their main contentions on appeal are the following: (1) that there was no probable cause to justify issuance of a search warrant for an apartment from which incriminating evidence was obtained;[3] (2) that the warrantless search of a delivery van in an underground parking garage violated the fourth amendment rights of two of the appellants; (3) that there was insufficient evidence to convict any of the appellants of importation offenses; (4) that there was insufficient evidence to convict one of the appellants of the conspiracy offenses; and (5) that there was an error in sentencing. We deal with each of these contentions seriatim.[4]

---

1. All three appellants were charged with the following offenses: conspiracy to import 1462.5 lbs. of marijuana in violation of 21 U.S.C. § 952(a) (Count I); importation of 1462.5 lbs. of marijuana in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2 (Count II); conspiracy to possess 1462.5 lbs. of marijuana with intent to distribute it, in violation of 21 U.S.C. § 846 (Count III); and possession of 1462.5 lbs. of marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count IV). In addition, appellant Hipolito Cruz Pagan was charged in a fifth count of possession of 15 grams of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

2. As to count V, Cruz Pagan was found not guilty of possession with intent to distribute in violation of 21 U.S.C. § 841(a), but guilty of a lesser included offense of simple possession in violation of 21 U.S.C. § 844.

3. Appellants also argue that if the warrant is held to be invalid, the search cannot be upheld as consensual. Since we find that the warrant was valid, we need not reach the consent issue.

4. Very briefly, the basic theory of the government's case was that the appellants were involved in a scheme to bring into this country from Colombia a large quantity of marijuana which would then be distributed. The government alleged that the marijuana was brought in by an airplane which landed at Yauco, Puerto Rico, and that this marijuana was subsequently seized by government agents at the time that

On December 5, 1972, a United States Magistrate issued a warrant for the search of apartment 311 in El Girasol Condominium in San Juan. (It is undisputed that this apartment belonged to appellant Cruz Pagan and that incriminating evidence was obtained therein.) In weighing the issue of probable cause for the warrant, the magistrate had before him an affidavit[5] of a customs agent which stated in pertinent part:

> "On November 12, 1972, information received from a reliable informant stated that Hipolito Cruz Pagan and Rafael G. Bordenave-Morales were involved in the smuggling of narcotics. On November 29, 1972 additional information stated that Cruz Pagan and Bordenave were in South America. On December 5, 1972 at about 2:00 a.m. aircraft HK–1487P landed without authority at Yauco, P. R., and police officers of Yauco observed a car which was on the runway speeding away, abandoning the aircraft, as they approached the airport. On December 5, 1972 a search of the area near the aircraft disclosed white paint residues where the car had collided and a license for a car bearing license plates 98N987, property of National Car Rental. On December 5, 1972 a check conducted at National Car Rental disclosed the car to be rented to Hipolito Cruz Pagan, that it was a white Chevrolet Impala, which car had not been returned to the Rental Company."

Appellants attack several of the factual allegations made in this affidavit. They first point out that the affidavit mentions a *car* speeding away, while the testimony at the suppression hearing was that it was only identified, by sound, as a *motor vehicle*. They next note that the affidavit states that the white Impala was rented to Hipolito Cruz *Pagan*, whereas it was brought out at the suppression hearing that the rental agency's records showed that the car was rented to Hipolito Cruz *Rivera*, the father of Cruz Pagan.[6]

■ Appellants contend that these were "intentional, relevant and non-trivial misstatements" requiring suppression under *United States v. Belculfine*, 508 F.2d 58, 63 (1st Cir. 1974). We do not agree. As to both references, the testimony at the hearing on the motion to suppress was imprecise. For example, although one officer merely heard the noise of a motor vehicle, another also testified to seeing red tail lights. On the question of who rented the car, it was variously stated that the name on the records was Hipolito Cruz Rivera and Hipolito Cruz. There was ample evidence to conclude, moreover, that in fact Cruz Pagan had rented the car with his father's credit card, or at least in his father's name. The district court, while not directly addressing the question in its opinion, appears to have accepted the two statements as essentially accurate. Under these circumstances, we cannot say that the references, if indeed they were inaccurate at all, rise to the level of "non-trivial misstatements".[7]

■ "[A]ffidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense

---

they arrested two of the appellants in a delivery van.

5. The magistrate also quite properly conducted an oral examination of the customs agent as to the reliability of the informant mentioned in the affidavit and was satisfied that he was reliable. This finding is not challenged on appeal.

6. Appellants also object to the affidavit's statement that a search of the area near the airplane had "disclosed white paint residues where the car had collided." They assert that the affiant "had no knowledge that in fact the white paint residue belonged to a *car* even less *the car*." This objection is easily answered, however, because the affiant did not say that he knew that paint residues came from the car; rather, he simply stated the objective facts which he knew, so that the magistrate could draw reasonable inferences from them. *See Irby v. United States*, 114 U.S.App.D.C. 246, 314 F.2d 251, 253, *cert. denied*, 374 U.S. 842, 83 S.Ct. 1900, 10 L.Ed.2d 1064 (1963).

7. We further note that the detailed evidence below as to how the information in this case developed and was relied upon by the government itself prior to presentation to the magistrate indicates the absence of an "intentional misstatement."

and realistic fashion," *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *see also Rosencranz v. United States*, 356 F.2d 310, 314 (1st Cir. 1966), and we sympathize with government agents who must operate in haste against a background of rapidly evolving and frequently ambiguous circumstances.[8] *See Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). We are convinced that the likelihood of the alleged discrepancies having any effect on the determination of probable cause was negligible, and that the policies underlying *Belculfine* simply are not called into play here. While the principles established in *Belculfine* continue to govern our approach to inaccurate affidavits, it should also be stated that "we do not read supporting affidavits with the same microscopic intensity as municipal bond counsel would a bond indenture." *United States v. Pond*, 523 F.2d 210, 214 (2d Cir. 1975).

The next—and most substantial—of appellants' arguments concerns the circumstances surrounding the arrest of Hipolito Cruz Pagan and Guillermo Rafael Bordenave after their departure from the underground parking garage of El Girasol Condominium. When federal agents were at the condominium, where Cruz Pagan lived, to execute the warrant discussed above, two of their number went into the building's underground parking garage, where there was parked a delivery van which they believed was linked to one or more of the appellants.[9] As the agents approached the van, they detected a strong odor of marijuana coming from it. At that point the agents did nothing further, but placed the van under surveillance planning to seek a warrant for it the next morning. Shortly thereafter, however, the van started to leave the garage; it was stopped, and the two occupants of the front seat were arrested. The agent testified that he then opened the cargo area of the van (which had been blocked from view with tape) to ascertain that no confederates were there. In the course of that search he discovered 1462.5 lbs. of marijuana. The sole point which appellants make with respect to this aspect of the appeal is that their fourth amendment rights were violated when the two agents entered the underground garage without a warrant.

The legal question which we must resolve is whether the agents' entry into the garage defeated the reasonable expectation of privacy of any of the appellants. *Ouimette v. Howard*, 468 F.2d 1363, 1365 (1st Cir. 1972); *see also Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). While this precise question[10] has not been extensively litigated, the highest courts of at least two states

8. There is no indication that any misstatements were the result of recklessness on the part of government agents. *See United States v. Carmichael*, 489 F.2d 983, 989 (7th Cir. 1973) (en banc).

9. The warrant referred only to Apartment 311 in the condominium and to "one white Chevrolet Impala . . ."; it made no mention of the underground garage or of a delivery van.

Although the agents did have some reason to suspect in advance that the delivery van *might* contain incriminating evidence, their decision to focus on the apartment and the Impala and not on the van was not so inherently unreasonable as to preclude them from subsequently invoking the "automobile exception" when they became aware that the van did in fact contain incriminating evidence. Unlike the situation in *United States v. Mitchell*, 525 F.2d 1275, 1277 (5th Cir. 1976), we do not here have to deal with an instance of "the extraordinary specificity of the government's advanced knowledge and planning of the search over . . . a prolonged time period."

10. Several cases have dealt with other common areas in apartment houses and have generally found no reasonable expectation of privacy. *See, e. g., United States v. Freeman*, 426 F.2d 1351 (9th Cir. 1970); *United States v. Llanes*, 398 F.2d 880 (2d Cir. 1968), *cert. denied*, 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969); *Polk v. United States*, 314 F.2d 837 (9th Cir.), *cert. denied*, 375 U.S. 844, 84 S.Ct. 96, 11 L.Ed.2d 72 (1963); *United States v. St. Clair*, 240 F.Supp. 338 (S.D.N.Y.1965); *State v. Crider*, 341 A.2d 1 (Me.1975); *Commonwealth v. Dinnall*, Mass., 314 N.E.2d 903 (1974); *Merica v. State*, 87 Nev. 457, 488 P.2d 1161 (1971). *But see Commonwealth v. Hall*, Mass., 323 N.E.2d 319 (1975) (distinguishing *Commonwealth v. Thomas*, 358 Mass. 771, 267 N.E.2d 489 (1971) on the basis of degree of tenant control over the hallway.)

**558**

have held that one does not have a reasonable expectation of privacy with regard to objects left in a common garage or basement of a multi-unit apartment house. *Commonwealth v. Thomas*, 358 Mass. 771, 267 N.E.2d 489 (1971); *People v. Terry*, 70 Cal.2d 410, 77 Cal.Rptr. 460, 454 P.2d 36 (1969), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2205, 26 L.Ed.2d 566 (1970).[11] We agree with these courts that a person cannot have a reasonable expectation of privacy (in the sense in which the term is used in *Ouimette* ) in such a well travelled common area of an apartment house or condominium. Whether or not the agents' entry was a technical trespass is not the relevant inquiry. *Ouimette v. Howard, supra* at 1365. *See also United States v. Conner*, 478 F.2d 1320, 1323 (7th Cir. 1973). Nor can it reasonably be maintained that such a common basement area was protected from search because it formed part of the "curtilage" and therefore should have been specifically named in the warrant. Assuming that concepts of curtilage have some relevancy to the *Katz* inquiry, the following statement of the Supreme Judicial Court of Massachusetts is clearly apposite here:

"This entry . . . did not invade an area within the 'curtilage' of . . . [appellant's] apartment. *See United States v. Miquel*, 340 F.2d 812, 814 (2d Cir.), cert. den. 382 U.S. 859, 86 S.Ct. 116, 15 L.Ed.2d 97. In a modern urban multi-family apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control. Cf. *Commonwealth v. Murphy*, 353 Mass. 433, 436–437, 233 N.E.2d 5; *Care v. United States*, 231 F.2d 22, 25 (10th Cir.), *cert. den.* 351 U.S. 932, 76 S.Ct. 788, 100 L.Ed. 1461; *McDowell v. United States*, 383 F.2d 599, 603 (8th Cir.). In such an apartment house, a tenant's 'dwelling' cannot reasonably be said to extend be-yond his own apartment and perhaps any separate areas subject to his exclusive control." *Commonwealth v. Thomas, supra* at 774–75, 267 N.E.2d at 491.

In sum, we hold that the agents' entry into the underground parking garage of El Girasol Condominium did not violate the fourth amendment, and that therefore the subsequent events (the discovery of the marijuana odor emanating from the van and the later arrest and search under the "automobile exception"), with their fruits, need not be excluded.

Appellants also claim that there was insufficient circumstantial evidence to convict them of the charges dealing with knowing importation of marijuana.[12] Specifically, they contend that there was not enough evidence to tie them in with the airplane found abandoned at the airport.

■ It is not the rule in this circuit that circumstantial evidence must exclude every reasonable hypothesis of innocence. *United States v. Currier*, 454 F.2d 835, 838 (1st Cir. 1972); *Dirring v. United States*, 328 F.2d 512, 515 (1st Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964). We need simply inquire "whether the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that defendant is guilty beyond a reasonable doubt." *Dirring v. United States, supra* at 515; *see United States v. Concepcion Cueto*, 515 F.2d 160, 162 (1st Cir. 1975). In evaluating a claim of insufficient evidence, we view the evidence as a whole, considering it "in the light most favorable to the government, together with all legitimate inferences to be drawn therefrom." *United States v. Doran*, 483 F.2d 369, 372 (1st Cir. 1973), *cert. denied*, 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974).

■ Applying these principles we are convinced, after a thorough examination of

---

11. *See also Commonwealth v. Kontos*, 442 Pa. 343, 276 A.2d 830 (1971).

12. The exact scope of appellants' appeal here is not clear. Their brief addresses itself only to the sufficiency of the evidence for conviction under Count I (conspiracy to import), but their substantive argument would be equally relevant to Count II (the importation itself). We therefore construe their appeal as though it were addressed to both counts.

the record, that there was more than enough evidence to support the convictions. Without delineating in great detail the case presented by the government, we need only cite the following as illustrative of the more significant pieces of evidence which it introduced: a car registration slip found at the landing site in Yauco which referred to the white Impala discussed above; the fact that the aircraft (used in the alleged smuggling scheme) was of Colombian registry; the fact that a thermos bottle cap was found on the plane and a thermos bottle in the delivery van; the fact that a walkie-talkie conversation was heard by government agents prior to the plane's landing and walkie-talkies were found in the delivery van, at apartment 311 in El Girasol, and in the Impala; and the fact that the marijuana found in the delivery van was wrapped in Colombian newspapers. In the light of all the evidence presented by the government and the reasonable inferences which the jurors could draw from it, we think there was an adequate basis upon which the jury could decide beyond a reasonable doubt that the appellants were guilty.

We reach the same conclusion as to the sufficiency of the evidence for Rafael Guillermo Bordenave's conviction. We have examined the entire record, but again we need itemize here only some of the more salient pieces of evidence introduced by the government to implicate Rafael Guillermo Bordenave in the various offenses specified in the indictment: his presence in the vicinity of El Girasol minutes before the arrest of the other two appellants in the delivery van; his presence shortly thereafter at the San Juan International Airport (not far from El Girasol) in a car in which there was a walkie-talkie; the fact that this was the same car which had been rented by Cruz, and the registration of which had been found at the Yauco airstrip; the presence in apartment 311 of a briefcase bearing the initials "R. B." and containing various personal papers of Rafael Guillermo Bordenave; the fact that the passports of this appellant and of Hipolito Cruz Pagan indicate that they had visited Colombia on the same dates. While the evidence against Rafael Guillermo Bordenave is not overwhelming, we think it contained enough probative elements from which the jury could make reasonable inferences and conclude that the appellant was guilty. *See Dirring v. United States, supra* at 515.

■ Finally, appellants contend—without any citation of authority or other form of argument—that they "should not have been sentenced on each count since they all were part of the same continuing criminal agreement, and only a single offense was committed even though it was charged in different counts." To the extent that this rather obscure contention alleges a disregard of our holding in *United States v. Honneus,* 508 F.2d 566, 569–70 (1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975), concerning multiple sentences for a single conspiratorial agreement, it is explicitly refuted by the very words employed by the sentencing judge:

"With respect to Counts I and III, the Court is going to follow the decision of *United States v. Honneus* . . . and hereby imposes concurrent imprisonment terms of four (4) years on each of said two counts of conspiracy, with the proviso that one of the two conspiracy counts and sentences shall be dismissed upon appellate affirmance of any of said two counts and sentences. . . ."

This form of sentencing was suggested by us in *Honneus, supra* at 570 n. 1. If, on the other hand, we construe appellants' contention as challenging the legality of imposing multiple punishments for a single nonconspiratorial act, it overlooks the well-established rule, acknowledged in *Honneus,* that Congress may treat different aspects of the same conduct as separate crimes when there is a meaningful distinction between the elements constituting each offense. *Id.* at 569, citing *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1957); *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 40, 76 L.Ed. 520 (1931).

*Affirmed.*