UNITED STATES of America

v.

Harold McMAHON and Richard Miles, Defendants.

Crim. No. 86–00029–B.

United States District Court, D. Maine.

Nov. 10, 1987.

Thomas Goodwin, Asst. U.S. Atty., Bangor, Me., for U.S.

Peter K. Mason, Searsport, Me., Stanley W. Brown, Jr., Belfast, Me., for defendants.

## MEMORANDUM AND ORDER

CYR, Chief Judge.

Defendants Harold McMahon and Richard Miles stand convicted of possession of "a quantity of hashish, a substance containing tetrahydrocannabinol ...," [1] with intent to distribute. The defendants move for a judgment of acquittal on the basis of the Government's failure to introduce at trial any of the substance which the defendants were charged with possessing or any chemical evidence that the substance defendants possessed contained tetrahydrocannabinol (THC).

## I. SUMMARY OF RELEVANT EVIDENCE

Three government witnesses testified concerning the so-called "sea-hash" recovered from McMahon and Miles at the time of their arrest.

The first of these witnesses, Dennis Appleton, an evidence technician with the Maine State Police (MSP) drug unit, provided other law enforcement officers with the sea-hash that eventually was sold to McMahon and Miles by an undercover agent. Appleton testified to certain characteristics of hashish and sea-hash. *See* Transcript of Trial Testimony of Dennis Appleton, Carroll Crandall and James R. Young [Tr.], at 3–14. He described sea-hash as "hashish

1. The indictment states:

The Grand Jury Charges: On or about March 18, 1986, in the District of Maine

HAROLD J. McMAHON
RICHARD H. MILES

defendants herein, knowingly and intentionally did possess with intent to distribute a quantity of hashish, a substance containing tetrahydrocannabinol, a Schedule I controlled substance; and did aid and abet in the commission of this crime;

All in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

that was brought up from the ocean floor along the Downeast Coast of Maine," Tr. at 6, and he described hashish as "a product of marijuana," containing the same active ingredient as marijuana, Tr. at 7. In addition, Appleton testified to having made available approximately 20 pounds of sea-hash, which he further described as more weathered than "black hash," to an agent for use in a drug investigation. Appleton stated that the sea-hash used in the investigation probably had been in the ocean for from one to six years.

The second of these witnesses, Carroll Crandall, is a MSP officer who handles a so-called "drug dog." [2] *See* Tr. at 14–27. Crandall was present with a drug dog at the time of the arrest of McMahon and Miles. Crandall testified that the dog was trained to detect marijuana and hashish. Crandall did not state whether or not the dog was trained to trigger to the THC in hashish and marijuana. At the scene of the arrest, the drug dog indicated *the presence of drugs, which Crandall,* based on his observations during other drug raids, *identified as sea-hash.*

The last of the three witnesses was Dr. James R. Young, a forensic chemist trained and experienced in drug analysis. *See* Tr. at 27–33. Dr. Young testified, in relevant part, as follows:

(Young) A. Hashish is primarily the resin from the cannabis, marijuana plant.

Q. What does resin mean?

(Young) A. On the marijuana plant, particularly on the blossiming (sic) part of it, on the sepals enclosing the blossom, and also on the leaves, to a lesser extent, is a resinous material. Seen under the microscope, it's little brown globules, or they look rather glassy under the microscope. This is the resin produced by that plant. And when gathered and packed together, it's referred to as hashish....

Q. All right. Does hashish have a so-called active ingredient?

(Young) A. Yes, it does. Actually, there's more than one active ingredient.

Q. What is an active ingredient?

(Young) A. Well, the active ingredient that most people think of as the active ingredient is tetrohydrocannabinol (sic), also known as THC from its initials. There are other materials present which, especially on heating, may break down and give active materials.

Q. But this THC then, would it be fair to characterize that as the primary active ingredient?

(Young) A. Yes, that's the primary active ingredient.

Q. Is that also an active ingredient of cannabis or marijuana?

(Young) A. Yes, it is.

. . . .

Q. What are the differences between sea-hash and non-sea-hash?

(Young) A. Well, the sea-hash, of which a great deal has come into the laboratory, was hashish that was dumped overboard down off the coast, and has since that time been, I suppose, occasionally picked up by fishing boats and by divers and such. And the—there are ways in which it differs from the ordinary hash that comes in. It's very rich in chloride ions, which one would expect from immersion in seawater. It is somewhat lower in THC content than some of the other hashish that comes in. It's stronger in THC content than some of the hashish that comes in.

Q. Does the immersion of that in salt water adulterate the drug?

(Young) A. I don't think adulterate is the right word. As I say, it brings about some changes. THC itself isn't very water-soluble, and it's even less soluble in salt water. But some of it does dissolve out. You notice a loss in the cannabinolic acids. They are particularly water-soluble. And quite often some of the sea-hash that comes in has been almost completely leached of the acids normally found in hashish....

Tr. at 28–32.

---

**2.** A "drug dog," according to Crandall, is a dog trained to detect certain controlled substances by their odor.

No other evidence was adduced at trial[3] as to the properties of the substance recovered at the scene of the arrest of McMahon and Miles.

At the request of defendants, without objection by the Government, the court instructed the jury as follows:

> As to the *first* element, you are instructed that tetrahydrocannabinol or THC, *is a controlled substance*. However, you will have to determine whether the evidence establishes beyond a reasonable doubt that any substance possessed by a defendant in fact contained *some* quantity of *tetrahydrocannabinol*. You may make the determination as to whether any such substance in fact contained THC on the basis of all relevant evidence in the case.

The jury returned a guilty verdict against each defendant.

## II. DISCUSSION

The defendants contend that there was insufficient evidence to sustain their convictions for possessing, with intent to distribute, hashish, a substance containing the Schedule I controlled substance THC, as charged in the indictment. First, the court must determine, as a matter of law, whether hashish is properly defined as "a derivative of marijuana" or as "a substance containing THC." Second, the court must determine whether the proof at trial was sufficient to support conviction.

3. A sample of sea-hash was displayed during the trial while Appleton was testifying, but was not offered into evidence.

4. The alternate spellings "marihuana" and "marijuana" refer to the same substance. The court uses the word "marijuana" except where there is a direct citation to the statutory spelling—"marihuana."

5. The history of synthetic THC is recounted in *Few v. State of Texas*, 588 S.W.2d 578, 581–82 (Tex.Crim.App.1979):

> When uniform narcotic drug laws were enacted in the thirties, the prohibited substance was "marihuana" in the Federal act while Texas called it "cannabis" and took note of and included varieties of cannabis known "as Marihuana, Hashish and Hasheesh," Article 725b, V.A.P.C., 1925 as amended. But as learning improved and synthetic drugs were

■ Schedule I of title 21 United States Code, section 812, lists both "Marihuana"[4] and "Tetrahy¹rocannabinois" as controlled substances. Although similar, marijuana and THC are mutually exclusive under the statute. Marijuana is defined as follows:

> all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; *the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin.* Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802(16) (*emphasis added*). The main active ingredient of marijuana is naturally occurring (organic) THC, the narcotic effects of which prompted the criminalization of marijuana. *See United States v. Walton*, 514 F.2d 201, 203–04 (D.C.Cir. 1975). By contrast, the THC listed in Schedule I is synthetic THC, a pure form of the primary active ingredient of marijuana synthesized in the laboratory. *United States v. Wuco*, 535 F.2d 1200, 1202 (9th Cir.), *cert. denied*, 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976).[5] Under the organic-synthetic THC dichotomy employed

> developed and abused, legislative bodies enacted "dangerous drug" laws. Persistent efforts led to successful synthesizing of THC about 1960, so that synthetic THC soon became available as a substitute for the organic substance. Contemporaneously, conventional wisdom held that drugs, substances and their immediate precursors should be controlled and regulated under one umbrella controlled substances act.

(*Footnote omitted.*)

Federal drug regulations explicitly define THC under Schedule I as synthetic THC. *See* 21 C.F.R. § 1308.11(d) (listing "Marihuana" and "Tetrahydrocannabinois" separately, and defining "Tetrahydrocannabinois" as "[s]ynthetic equivalents of the substances contained in the plant, or in the resinous extractives of *Cannabis* ...").

in Schedule I, hashish and sea-hash (both of which are concentrated forms of THC-rich marijuana resins) properly are characterized as marijuana derivatives, not as substances containing THC. *Taylor v. United States*, 550 F.2d 983, 986 (4th Cir.1977); *United States v. Wuco*, 535 F.2d at 1202; *United States v. Kelly*, 527 F.2d 961, 964 (9th Cir.1976); *Few v. State of Texas*, 588 S.W.2d 578, 582 (Tex.Crim.App.1979).[6]

▪ The minimum evidence required to prove that the sea-hash in this case was a derivative of marijuana would not suffice to prove that the sea-hash contained the Schedule I-listed substance THC. The Government's failure to produce forensic chemical evidence that the sea-hash in this case contained THC, or to produce expert testimony that all THC could not be leached from the sea-hash while immersed in the sea, may well have required acquittal.

In order to prove that the substance seized from the defendants was a derivative of marijuana, however, the Government was not required to prove that the sea-hash contained THC, organic or synthetic. *See United States v. Spann*, 515 F.2d 579, 583 (10th Cir.1975) (detailed discussion rejecting argument that proof of presence of THC is essential to sustain conviction for possession of marijuana).[7] Rather, the test of the sufficiency of the

proof is whether it showed beyond a reasonable doubt that the substance seized from these defendants was hashish and, thus by law, a derivative of marijuana. The cumulative testimony of Appleton, Crandall, and Young, while arguably insufficient to prove the presence of THC, was sufficient to show that the substance possessed by defendants was sea-hash—a proscribed derivative of marijuana.[8]

▪ The remaining issue concerns the variance between the charge contained in the indictment and the description of the charge given to the jury, on the one hand, and the proof presented at trial. The indictment charges possession, with intent to distribute, hashish, a substance containing THC, and the jury instructions adopt that characterization of the offense as well. A variance is fatal if (1) the defendants were not put on reasonable notice of the charge against them, and (2) the variance exposed the defendants to double jeopardy. *See United States v. Brien*, 617 F.2d 299, 312–13 (1st Cir.), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980).

In *Brien*, the indictment charged the defendants with illegally mailing a *sugar* option, whereas the proof at trial concerned the mailing of a *copper* option. The First Circuit found no fatal variance, because the defendants clearly knew which option was

6. The legislative history supports this conclusion. *See* 81 Cong.Rec. H5690 (daily ed. June 14, 1937) (statement of Rep. Vinson) ("May I say . . . that the term 'marihuana' refers to the same thing that we heard throughout the years termed 'hashish.'"). *United States v. Lochan*, 674 F.2d 960 (1st Cir.1982), which states that "[h]ashish is a schedule I substance if it contains [THC] . . .," 674 F.2d at 969, does not foreclose characterization of hashish as a derivative of marijuana. Moreover, reading *Lochan* to allow characterization of hashish as a substance containing THC *in addition* to its characterization as a derivative of marijuana, even though the present analysis suggests that hashish properly may be characterized *only* as a derivative of marijuana, does not preclude the court's disposition of the present case.

7. The nonexistence of such a requirement is supported further by comparison to cases rejecting the so-called "species defense." In *United States v. Honneus*, 508 F.2d 566 (1st Cir.1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, 44

L.Ed.2d 101 (1975), the First Circuit, joining several other courts, held that, although Congress mentioned only *Cannabis sativa L.* In defining marijuana, Congress meant to include any and all species of marijuana-producing *Cannabis*. 508 F.2d at 574–75. *See also United States v. Kelly*, 527 F.2d 961, 963 (9th Cir.1976) (applying the species defense to hashish); *United States v. Walton*, 514 F.2d 201 (D.C.Cir.1975). In *Honneus*, the court upheld a conviction although there was no chemical analysis of the substance at issue; the court held that the defendant's identification of the substance as marijuana was sufficient.

8. Appleton, who testified that he had been involved in 40 to 50 hashish cases, identified as sea-hash the substance that he obtained from a secured evidence locker and gave to undercover agents to sell to defendants. Tr. at 8–11. Crandall, also familiar with sea-hash as a result of his participation in drug investigations, identified the substance seized from the defendants at the time of their arrest as sea-hash. Tr. at 20.

at issue, and all other critical facts in the case were correctly alleged and proved by the Government. *See also United States v. Ramos,* 666 F.2d 469, 476–78 (11th Cir. 1982) (variance not fatal where indictment alleged conspiracy to distribute methaqualone, but Government proved conspiracy to distribute diazepan).

■ Similarly, these defendants could not have been confused about the charge against them. The indictment specifically charged the defendants with possession of *hashish,* and correctly alleged other critical facts, such as the date of the offense.

An indictment alleging facts constituting an offense under one statute does not present a double jeopardy problem even though it charges a violation of another statute. *United States v. Wuco,* 535 F.2d at 1202; 41 Am.Jur.2d, *Indictments and Informations* § 263. This rule is especially appropriate for application in the present case because these defendants, in defending against the charge of possessing a substance (hashish) containing THC, *necessarily* understood that they were required to defend against the more easily proven charge of possessing hashish, the substance allegedly containing THC.

The indictment adequately alerted defendants to the need to defend against the charge of possession of hashish; the present record readily would serve to raise a bar to their reprosecution under federal law for their actions in this case. *See United States v. George,* 752 F.2d 749, 753–54 (1st Cir.1985) (Defendant "... was convicted for conspiracy to manufacture amphetamine, and as to this drug, these actors, this time period, and this setting, [defendant] cannot be required to stand trial again.") (Coffin, J.)

As requested by the defendants and without objection by the Government, the pertinent jury instructions twice repeat the language of the indictment charging the defendants with "possession of hashish, containing [THC], a schedule I controlled substance, with intent to distribute." The

instructions make no further mention of hashish in describing the elements of the offense. Instead, the jury was instructed to determine whether any substance possessed by the defendants contained THC.

Where jury instructions leave no doubt as to the circumstances under which the crime can be found to have been committed, the instructions are adequate. 2 Wright, *Federal Practice and Procedure: Criminal 2d,* § 487. An instruction is not to be evaluated in isolation, but in the context of the overall charge. *United States v. Lavoie,* 721 F.2d 407, 409 (1st Cir.1983), *cert. denied,* 465 U.S. 1069, 104 S.Ct. 1424; 79 L.Ed.2d 749 (1984). By twice identifying the substance allegedly possessed by defendants as "hashish containing THC," the jury instructions, considered as a whole against the backdrop of the evidence adduced at trial, made it crystal clear that the jury could conclude that the substance possessed by the defendants contained THC *only if* the jury first determined that that substance was *hashish.*

A jury finding that the substance possessed by the defendants was hashish is necessarily implied by these guilty verdicts. In other words, there being no allegation and no proof that defendants possessed any substance other than hashish (whether or not it contained THC), the return of guilty verdicts under these instructions[9] was permissible only if the evidence supported, as it clearly did, a finding that the defendants possessed hashish. Nor can the fact that the jury went on to find that the hashish possessed by the defendants contained THC, as to which the proof may have been insufficient, logically be employed to generate reasonable doubt about their predicate finding that the defendants possessed hashish, as to which the evidence was overwhelming.

Considered as a whole, the jury instructions, however imprecise and inartful, were adequate to preclude guilty verdicts unless the defendants were found to have possessed *hashish,* with intent to distribute.

9. Defendants make no claim that the jury disregarded, misunderstood or otherwise failed to follow these instructions.

*Cf. United States v. Melton,* 491 F.2d 45, 57–58 (D.C.Cir.1973) (allowing conviction for unlawful entry where jury, which was instructed on elements of burglary, but not lesser offense of unlawful entry, *necessarily* found facts proving unlawful entry in returning guilty verdict on burglary charge).

### III. CONCLUSION

The defects in the indictment and in the jury instructions did not affect any substantial right of either defendant.

Accordingly, the motions for judgments of acquittal are DENIED.

SO ORDERED.