In re KURTH RANCH; Kurth Halley Cattle Company; Richard M. and Judith Kurth, husband and wife; Douglas M. and Rhonda I. Kurth, husband and wife; and Clayton H. and Cindy K. Halley, husband and wife, Debtors.

Robert G. DRUMMOND, Trustee; Kurth Ranch; Kurth–Halley Cattle Company; Richard M. and Judith M. Kurth; Douglas M. and Rhonda I. Kurth; and Clayton H. and Cindy K. Halley, Plaintiffs,

v.

DEPARTMENT OF REVENUE OF the STATE OF MONTANA, Defendants.

Bankruptcy No. 88–40629.
Adv. No. 289,0042.

United States Bankruptcy Court, D. Montana.

May 8, 1990.

Neal Jensen, Great Falls, Mont., Asst. U.S. Trustee.

Keith A. Maristuen, Havre, Mont., for debtors.

John C. Doubek, Helena, Mont., for trustee.

Robert G. Drummond, Great Falls, Mont., trustee.

Arthur G. Matteucci, Great Falls, Mont., for Norwest Bank.

R. Bruce McGinnis, Tax Counsel, Office of Legal Affairs, David W. Woodgerd, Chief Legal Counsel, Paul Van Tricht, Tax Counsel, Mont. Dept. of Revenue, Helena, Mont., for defendants.

James H. Goetz, Jim W. Vogele, Bozeman, Mont., for plaintiffs.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

The Plaintiff/Trustee and Debtors filed a Complaint under Bankruptcy Rule 7001 to contest the tax assessed pre-petition against the Debtors by the Defendant,

Montana Department of Revenue (D.O.R.) under the Montana Dangerous Drug Tax Act, Section 15–25–101, et seq., Mont.Code Ann. (1987). The Complaint states thirteen different counts for relief, all of which are denied by the D.O.R. Following answer and discovery, each party sought summary judgment under Bankruptcy Rule 7056, which motions were denied in toto by the Court. The case proceeded to trial on March 27 and 28, 1990. Briefs have been filed by the respective parties and the matter is ripe for decision.

The parties concede this Court has jurisdiction to try and decide this matter under 28 U.S.C. Section 1334 and 11 U.S.C. Section 505, because the tax claim has not been contested by the Debtors and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the filing of the Chapter 11 case. *In re Lipetsky,* 64 B.R. 431 (Bankr.Mont.1986); *Quattrone Accountants, Inc. v. I.R.S.,* 895 F.2d 921 (3rd Cir.1990). *Lipetsky* states:

"The determination of a debtor's tax liability is a core proceeding under Section 157 of the Code, and this Court thus has jurisdiction [under Section 505] to determine the amount and legality of the tax, except where said tax has been fixed by final order of an administrative or judicial tribunal, after being reasonably contested by the taxpayers." *Id.* at 434.

The final Pre–Trial Order signed in this adversary proceeding sets forth Agreed Facts as follows in paragraphs 1–27, to-wit:

1. The Plaintiff, Richard M. Kurth, is a former rancher/farmer who, along with the other Plaintiffs in this action, engaged in a mixed grain and livestock operation on their Choteau County, Montana, farm.

2. The Plaintiff, Judith M. Kurth, is the wife of Richard M. Kurth. Mrs. Kurth assisted her husband and the other Plaintiffs in the operation of the Plaintiffs' ranch and farm.

3. The Plaintiff, Douglas M. Kurth, is the son of Richard and Judith Kurth and participated in the farm and ranch operations conducted on the Plaintiffs' Choteau County, Montana, ranch and farm.

4. The Plaintiff, Rhonda I. Kurth, is the wife of Douglas M. Kurth and participated in the farm and ranch operations conducted on the Plaintiffs' Choteau County, Montana, ranch and farm.

5. The Plaintiff, Clayton H. Halley, is the son-in-law of Richard and Judith Kurth and participated in the Plaintiffs' farm and ranch operations in Choteau County, Montana.

6. The Plaintiff, Cindy K. Halley, is the wife of Clayton Halley and daughter of Richard and Judith Kurth. Mrs. Halley assisted in the farm and ranching activities conducted on the Plaintiffs' ranch and farm.

7. The Kurth–Halley Cattle Company was a family partnership engaged in the business of raising and selling livestock. The partners in the Kurth–Halley Cattle Company were Doug and Rhonda Kurth and Clayton and Cindy Halley.

8. The Plaintiff, Kurth Ranch, was the name for the general farm and ranch operations conducted by the above-named Plaintiffs on their Choteau County ranch and farm.

9. The Plaintiff, Robert G. Drummond, is the Trustee of the bankruptcy estate.

10. The Defendant, State of Montana, Department of Revenue, is an executive branch agency created by MCA § 2–15–1301.

11. The Plaintiffs (Richard and Judith Kurth, Clay and Cindy Halley, and Doug and Rhonda Kurth) were formerly engaged in a mixed grain and livestock operation on their Choteau County, Montana, farm.

12. After suffering for several years from drought and low market prices, the Plaintiffs incurred large debts and faced the prospect of losing their family farm.

13. The Plaintiffs, in December, 1985 or January, 1986, began growing and selling marijuana.

14. The Plaintiffs' marijuana operation continued until October 18, 1987, when state and federal law enforcement personnel raided the Plaintiffs' farm.

15. On October 18, 1987, the State of Montana seized the following alleged items from the Plaintiffs:

"Item # 1: 2155 marijuana plants in various stages of growth,

Item # 2: 7 gallons of hash oil,

Item # 3: 4 bags of marijuana at two pounds each,

Item # 4: 65/one gram vials of hash tar,

Item # 5: 14 baby food size jars of hash tar,

Item # 6: 7 pint jars of hash tar,

Item # 7: 1 bag of marijuana, ¼ pound,

Item # 8: 5 plastic bags of marijuana; total 2230 grams,

Item # 9: approximately 100 pounds of marijuana stems, leaves, parts, etc."

16. The Plaintiffs were subsequently charged by Information with criminal possession and sale of dangerous drugs.

17. On July 18, 1988, after the Plaintiffs entered guilty pleas, the Honorable District Court Judge Chan Ettien of the Montana Twelfth Judicial District, Choteau County, sentenced the Plaintiffs to the following prison terms:

a. *Richard M. Kurth: Count I:* The Defendant is sentenced to a term of twenty (20) years in the Montana State Prison with the last fifteen (15) years suspended for the commission of the offense of criminal sale of dangerous drugs, marijuana, in violation of Montana law Section 45–9–101, MCA; *Count II:* The Defendant is sentenced to a term of twenty (20) years in the Montana State Prison with the last fifteen (15) years suspended for the commission of the offense of criminal possession of a dangerous drug, marijuana, with intent to sell in violation of Montana law, Section 45–9–103, MCA; *Count III:* The Defendant is sentenced to a term of twenty (20) years in the Montana State Prison with the last fifteen (15) suspended for the commission of the offense of solicitation to commit the offense of criminal possession of a dangerous drug, marijuana, with in-tent to sell, in violation of Section 45–4–101, MCA; and *Count IV:* The Defendant is sentenced to a term of five years in the Montana State Prison for the commission of the offense of criminal possession of a dangerous drug, hashish, in violation of Montana law Section 45–9–102, MCA.

b. *Judith M. Kurth:* The Defendant ... is hereby sentenced to a term of five (5) years in the Women's Correctional Center in Warm Springs, Montana, or such other authorized place, with the last four (4) years suspended for the commission of the crime of conspiracy to commit the offense of criminal possession of a dangerous drug, marijuana, with intent to sell, a felony, in violation of Montana law, Section 45–4–102, MCA;

c. *Douglas Kurth:* The Defendant ... is hereby sentenced to a term of twenty (20) years in the Montana State Prison, Deer Lodge, Montana, with all twenty (20) years suspended for the commission of the crime of conspiracy to commit the offense of criminal possession of a dangerous drug, marijuana, with intent to sell, a felony, in violation of Montana law, Section 45–4–102, MCA;

d. *Rhonda Kurth:* The imposition of sentence upon the Defendant, Rhonda Kurth, [is] deferred for a period of three (3) years for the commission of the crime of conspiracy to commit the offense of criminal possession of a dangerous drug, marijuana, with intent to sell, a felony, in violation of Montana law, Section 45–4–102, MCA;

e. *Clay Halley:* The Defendant ... is hereby sentenced to a term of ten (10) years in the Montana State Prison with all of that time suspended for the commission of the crime of conspiracy to commit the offense of criminal possession of a dangerous drug, marijuana, with intent to sell, a felony, in violation of Montana law, Section 45–4–102, MCA;

f. *Cindy Halley:* The imposition of sentence upon the Defendant, Cindy Halley, [is] deferred for three (3) years for the commission of the crime of conspiracy to commit the offense of criminal possession of a dangerous drug, marijuana, with intent to sell, a felony, in violation of Montana law, Section 45–4–102, MCA.

18. MCA § 15–25–111(1) provides "a tax on the possession and storage of dangerous drugs," and imposes liability for the "tax" on "each person possessing or storing dangerous drugs."

19. MCA § 15–25–111(2) provides that the amount of the "tax" due is the greater of the following:

(a) 10% of the assessed market value of the drugs, as determined by the department; or

(b)(i) $100 per ounce of marijuana, as defined in 50–32–101, or its derivatives, as determined by the aggregate weight of the substance seized;

(ii) $250 per ounce of hashish, as defined in 50–32–101, or its derivatives, as determined by the aggregate weight of the substance seized;

(iii) $200 per gram of any substance containing or purported to contain any amount of a dangerous drug included in Schedule I pursuant to 50–32–222(1), (2), (4), and (5), or Schedule II pursuant to 50–32–224(1) through (4), as determined by the aggregate weight of the substance seized;

(iv) $10 per 100 micrograms of any substance containing or purported to contain any amount of lysergic acid diethylamide (LSD) included in Schedule I pursuant to 50–32–222(3), as determined by the aggregate weight of the substance seized;

(v) $100 per ounce of any substance containing or purported to contain any amount of an immediate precursor as defined under Schedule II pursuant to 50–32–224(5), as determined by the aggregate weight of the substance seized; and

(vi) $100 per ounce of any substance containing or purported to contain any amount of dangerous drug not otherwise provided for in this subsection (2).

20. The Defendant initially assessed a Jeopardy Assessment Tax on marijuana and hash tar in the amount of $445,152.25, plus a ten percent (10%) penalty and one percent (1%) interest, for a total due on December 8, 1987, of $491,776.20.

21. Included within this initial assessment was a tax in the amount of $213,-345.00 against 2,155 growing marijuana plants.

22. The Montana Controlled Substances Act, provisions of which are incorporated by reference into MCA § 15–25–111(2), fails to provide a definition of "hash tar."

23. Defendant subsequently revised the assessment, adding a claim for 896 ounces of hash oil at $250.00 per ounce, plus penalty and interest, resulting in a Revised Jeopardy Assessment on May 7, 1988, of $750,-096.68.

24. The Montana Controlled Substances Act, provisions of which are incorporated by reference into MCA § 15–25–111(2), fails to provide a definition of "hash oil."

25. Pursuant to the Jeopardy Assessment and Revised Jeopardy Assessment, Defendant has levied upon and seized property and accounts of the Plaintiffs totalling $30,680.01. The assessment is subject to a Judgment and Order of Forfeiture entered by the Honorable District Judge, Chan Ettien of the Montana Twelfth Judicial District Court, Choteau County, in Cause No. DV–87–093.

26. The Defendant initially caused to be filed with this Court in *In re Kurth Ranch; Kurth–Halley Cattle Company; Richard M. Kurth and Judith Kurth (H & W); Douglas M. and Rhonda I. Kurth (H & W); and Clayton H. and Cindy K. Halley (H & W), Debtors,* Case No. 88–40629, a Proof of Claim for "tax" liabilities in the of $908,078.14.

27. Thereafter, the Defendant, Montana Department of Revenue has caused to be filed herein an Amended Proof of Claim for "tax" liabilities under 11 U.S.C. § 507(a)(7)(A), (C) and (E) in the sum of $864,940.99, consisting of $684,914.30 in

principal, $113,134.44 in penalties and $66,-914.30 in interest itemized as follows:

| | | |
|---|---|---|
| 1987 (sic) Montana Dangerous Drug Tax: | | $669,152.25 |
| Penalty: | | $111,634.44 |
| 12% Interest 12/8/87–9/8/88: | | $ 66,914.30 |
| | TOTAL: | $847,690.99 |
| | | (sic) |
| | | |
| 1987 (sic) Montana Dangerous Drug Tax: | | $ 15,750.00 |
| Penalty: | | $ 1,500.00 |
| 12% Interest 12/8/87–9/8/88 | | $ 0 |
| | TOTAL: | $ 17,250.00 |

The Montana Dangerous Drug Tax Act went into effect on October 1, 1987, about 17 days before the confiscation of the marijuana and related paraphernalia by the Choteau County Sheriff's Office, and U.S. Drug Enforcement Administration (D.E.A.). Regulations dealing with the tax law were not promulgated by the D.O.R. until November 13, 1987. Mont.Admin.R. (ARM.) § 42.34.101 et seq. (1987).

The evidence shows the Plaintiff/Debtors first attempted to grow marijuana from seeds, but such attempts failed to produce any quantity of merchantable crop. Debtors then purchased 86 marijuana plants for $2,500.00, which plants died, and they were then supplied 80 additional plants in the summer of 1986, when Debtors commenced their growing operation inside buildings and trailers located on the family ranch. The business expanded to the largest marijuana growing operation in the State of Montana when shut down by law enforcement authorities in October, 1987. According to Richard Kurth, each marijuana plant, when fully matured and ready to harvest, produced .65 ounces of marijuana buds, which he sold for about $73.15 per bud. Initially, each plant was destroyed after one harvest, but toward the end of the operation, Debtors began boiling the stems and leaves of the remaining plant (called "shake") in alcohol in an attempt to manufacture marijuana oil or "hash oil." "Shake" is a derivative of the marijuana plant which has less street value because it contains lower tetrahydrocannabinol (THC),

the chemical substance in the marijuana bud which activates a user's senses.

The Debtor's operation was closed on October 18, 1987, when law enforcement officers arrested the Debtors and confiscated all plants, materials and paraphernalia on the premises. Under the Montana Drug Tax Act, the arresting officer is obligated to send to the D.O.R., on a form prepared by the D.O.R., a Drug Tax Report listing each item seized. It is noteworthy in this case that the report sent by the Choteau County Sheriff was the first report sent to the D.O.R. because the law became effective just shortly before the drug operation was shut down. Moreover, the arresting officers were provided absolutely no instructions on the form or by other separate instructions from the D.O.R. as to how the report was to be prepared and filed. It is obvious from the evidence in this case that the law enforcement personnel were primarily concerned, as they rightly should have been, with the criminal aspects of the case than with the newly exacted Drug Tax Act. Accordingly, Douglas Williams, Deputy Sheriff, prepared and filed with the D.O.R. under date of November 16, 1987, the Drug Tax Report which listed the following items, to-wit:

"Item # 1: 2155 marijuana plants in various stages of growth,

Item # 2: 7 gallons of hash oil, (lined out),

Item # 3: 4 bags of marijuana at two pounds each,

Item # 4: 65/one gram vials of hash tar,

Item # 5: 14 baby food size jars of hash tar,

Item # 6: 7 pint jars of hash tar,

Item # 7: 1 bag of marijuana, ¼ pound,

Item # 8: 5 plastic bags of marijuana; total 2230 grams,

Item # 9: approximately 100 pounds of marijuana stems, leaves, parts, etc."

Item # 2 on the report was lined out because the substance had not undergone chemical analysis by the Montana Division of Forensic Science. The first report contained no monetary value of each item. Thereafter, on November 18, 1987, Deputy Sheriff Williams sent a letter to the Choteau County Attorney regarding the Dangerous Drug Tax Report stating he had requested a dollar amount from D.E.A. to send to the D.O.R. In the November 18, letter, Williams set forth values of each item as follows:

"Item # 1: Marijuana plants valued at $1,500.00,

Item # 2: Hash oil—no value set

Item # 3: 8 pounds of marijuana at $16,000.00,

Item # 4: Vials of hash tar, $10/gram—$650.00

Item # 5: Baby food size jars hash tar figured at 8 oz.,

Item # 6: Pint jars of hash tar @ $700.00/oz.,

Item # 7: Marijuana @ $2,000.00/lb.

Item # 8: 2230 grams of marijuana @ $2,000.00/lb.,

Item # 9: approximately 100 pounds of shake at $200.00/lb."

Following such report, on December 1, 1987, Williams sent a letter to Robert S. McGee, head of the Miscellaneous Tax Division of D.O.R., stating that the tax report was previously forwarded on the Kurth operation, and the values of Items 1–9 above set forth in the November 18, letter were repeated in the December 1, letter. Williams stated the values were obtained from the Drug Enforcement (D.E.A.) agent in Great Falls and "the prices are very defensible by the D.E.A. and by the Montana Department of Justice/Criminal Investigation Bureau." Williams advised that if

D.O.R. wished to value the hash oil, it should await doing so until the forensic laboratory had an opportunity to test the samples' quality and quantity. On November 20, 1987, Williams sent to the forensic laboratory for testing 23 separate samples of materials, including samples of hash oil, hash tar, fifty-six random samples of leaves taken from the 2155 plants (randomly selected), random samples from ten plastic bags of marijuana and samples from the box of shake. Without waiting for the lab report, which was issued on December 30, 1987, McGee proceeded to issue the tax assessment, excluding hash oil, on December 7, 1987. McGee conceded at trial he was not an expert on valuation of illegal drugs, and this was the first assessment made under the Drug Tax Act. He called some individuals associated with the D.E.A. in San Francisco about values, but cannot remember the substance of any conversation. He made no contact with the D.E.A. agent in Great Falls, who Williams had reported to have valued the lot. The only documentation of the assessment is the reports from Choteau County and the assessment notice. In making the plant assessment he stated he relied on the value fixed by the Choteau County sheriff's officer, who had reported that the plants were in various states of growth. It is noteworthy that none of the plants were weighed, McGee had no knowledge of the various plant sizes because he did not personally inspect the operation (and never has), he had no information as to budding contents, and his assessment was based on "inhouse" discussions with the D.O.R. legal and administrative staff. At trial, McGee was extremely vague as to the substance of any conversation or the results of his cursory investigation as to value.

The December 7, 1987, Statement of Tax Computation, (Exhibit 18) sent to each Debtor individually, calculated the tax as follows:

"Tax on possession and storage of dangerous drugs is the greater of, 10% of assessed market value or dollar amount per weight; 15–25–111, MCA.

2155 Marijuana plants, 10 states of growth value reduced 10% each stage

| Plants | Value per Plant | Total Value | 10% Market Value Tax |
|---|---|---|---|
| 215.5 | $1,800.00 | $387,900.00 | $ 38,790.00 |
| 215.5 | $1,620.00 | $349,110.00 | $ 34,911.00 |
| 215.5 | $1,440.00 | $310,320.00 | $ 31,032.00 |
| 215.5 | $1,260.00 | $271,530.00 | $ 27,153.00 |
| 215.5 | $1,080.00 | $232,740.00 | $ 23,274.00 |
| 215.5 | $ 900.00 | $193,950.00 | $ 19,395.00 |
| 215.5 | $ 720.00 | $155,160.00 | $ 15,516.00 |
| 215.5 | $ 540.00 | $116,370.00 | $ 11,637.00 |
| 215.5 | $ 360.00 | $ 77,580.00 | $ 7,758.00 |
| 215.5 | $ 180.00 | $ 38,790.00 | $ 3,879.00 |

Tax on Marijuana Plants     $213,345.00

Other dangerous drugs

| Amount | Tax per ounce | Tax |
|---|---|---|
| 1811 oz. Marijuana | $100.00 | $181,100.00 |
| 118 oz. Hash Tar | $250.00 | $ 29,500.00 |

Tax on other drugs     $210,600.00

Total Tax     $423,945.00

| | |
|---|---|
| 5% Admin. Fee | 21,197.25 |
| 10% Penalty | 42,394.50 |
| 1% Interest | 4,239.45 |
| Total Due | $491,776.20" |

McGee did not initially value for tax purposes the seven gallons of hash oil because he had no basis on which to fix a value. That item was tested by the forensic laboratory which issued its report on December 31, 1987, stating in part:

"There is no definition of 'hash oil' in the Montana Controlled Substances Act—or weight ascribed distinguishing felony possession from misdemeanor possession. Because hash oil contains tetrahydrocannabinol (THC), a Schedule I controlled substance, possession of any amount constitutes a felony. Therefore, I did not dry down the hash oil samples to obtain accurate weights since weights are irrelevant. These liquid samples contain varying amounts of volatile solvents which would be represented in a sample weight."

On May 6, 1988, McGee, without requesting the forensic laboratory dry down the oil sample for weight to be assessed under the Drug Tax Act, revised the tax assessment to include a claim for what he termed "Hash Oil," but which was assessed as hashish. He fixed the tax based on 896 ounces of hash oil at $250.00 per ounce for a principal tax of $224,000.00, $22,400.00 for penalty, interest at $15,680.00, for a total additional tax of $262,080.00. Thus, the total tax assessed was $750,096.68. Interest accruing to the date of the Debtors' petition, together with credit for about $30,000.00 collected in state court proceedings, brings a total tax due of $864,940.99.

Whether applying federal or state law, the test of whether the tax is excessive, or arbitrary and capricious, is the same. *Corcoran v. State Board of Equalization*, 116 Mont. 499, 154 P.2d 795, 797 (1945) holds:

"It is well settled that the courts will not substitute their judgment for that of the taxing officials in fixing the value of property for tax purposes. *Danforth v. Livingston*, 23 Mont. 558, 59 P. 916; *Johnson v. Johnson*, 92 Mont. 512, 15 P.2d 842. The courts will intercede however when it appears that the valuation fixed by the taxing officials is so grossly excessive as to amount to arbitrary action or to be inconsistent with the exercise of an honest judgment. *International Business Machine Corporation v. Lewis and Clark County*, 111 Mont. 384, 112 P.2d 477; *Investors Security Co. v. Moore*, 113 Mont. 400, 127 P.2d 225. For purposes of taxation the terms 'value' and 'full cash value' mean the amount at which property would be taken in payment of a just debt due from a solvent debtor. Ch. 99, Laws 1939."

*Corcoran* involved a factual setting where city lots were valued by the County Assessor at about 10 times their value. The court found the assessment excessive, and therefore arbitrary.

In *Pizzarello v. United States*, 408 F.2d 579 (2nd Cir.1969), a case involving an illegal gambling operation, a jeopardy assessment under 26 U.S.C. § 6862(a) was made by the Internal Revenue Service. *Pizzarello* held:

"We begin with the assumption that a tax assessment is presumptively valid and that the burden is on the taxpayer to prove its invalidity. *Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Commissioner of Internal Revenue v. Hansen*, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959). Such a presumption is not evidence itself and disappears upon the introduction of evidence to overcome it. *Compton v. United States*, 334 F.2d 212 (4th Cir.1964); *New York Life Insurance Co. v. Gamer*, 303 U.S. 161 58 S.Ct. 500, 82 L.Ed. 726 (1938); *Kentucky Trust Co. v. Glenn*, 217 F.2d 462 (6th Cir.1954)." *Id.* at 583.

Both cases stand for the time honored proposition that if the tax is excessive, it is arbitrary and capricious, and must be set aside.

McGee's assessment of valuation for several items was arbitrary in that it lacked any basis in fact. As noted above, McGee assessed the plants in various stages of growth by simply dividing the 2155 plants into 10 categories, and then depreciating each category by 10% from a beginning value of $1,800.00 per plant. Yet Williams, ostensibly based on D.E.A. reports, valued the plants at $1,500.00 each. Keith Aller, D.E.A. Administrator for Montana, testified he was never consulted by McGee, and he participated in valuation of the plants at the $1,500.00 figure reported by Williams. But that value, according to Aller, was fixed based on a producing marijuana plant with 2 pounds of bud from a 12 foot plant. None of the plants seized which were in full growth were over 2 to 3 feet in height and no weight of bud was taken from any plant, even though the means to do so was available. Aller then conceded "there is no market for growing plants" from his experience. His value thus came from extrapolation of the value of the bud produced vis-a-vis the value of "street" or retail marijuana. He confessed a plant which was of the size found at the Kurth Ranch could not produce 2 pounds of marijuana. Such is consistent with the testimony of Richard Kurth, who was not questioned by McGee prior to the assessment, that the fully grown pygmy plants produced about .65 ounces per plant. Thus, the value of the plants was materially over-valued.

In addition, the breakdown by McGee into 10 categories is completely arbitrary. According to the best of the testimony, over 1300 of the plants were mere cuttings as shown by the photographs taken by the Sheriff's Department on the day of the arrest. Based on the evidence, coupled with a failure of D.O.R. to instruct the Sheriff's Department to weigh the marijuana bud on each plant, which it is conceded could have been readily accomplished, the fixing of any value on the plants simply lack credible basis. Indeed, when answers to written interrogatories were made by the sheriff's office personnel, on behalf of the D.O.R., it developed that the plants in various stages of growth depended on the

number of growing hours of each lot, which ranged from 18 to 12 hours. According to the verified answers, 1313 plants were located in 18 hour growing rooms and 918 located in 12 hour growing rooms. Deputy Sheriff Saville testified that the 1313 plants were mere cuttings placed in 4″ by 4″ boxes. From all the evidence, it is clear the cuttings are of no value. It is important to remember that under D.O.R. regulations "market value" is fixed at the time of confiscation of the drug. Mont.Admin.R. 42.34.101(2) (ARM). If the plant contains no THC substance on that date, no tax can be established for there is no dangerous drug. Thus, it is imperative the plants be dried, weighed, and chemically tested for THC to establish the tax. Weight is also a criteria under the Drug Tax Act. Such was not accomplished in this case. It is also clear that McGee did not have such information available, nor did he request such data, when he issued the tax assessment. Nor has the D.O.R. changed the assessment when such evidence was produced upon discovery. In sum, as to the plant valuation, D.O.R. has steadfastly clung to the totally inappropriate assessment method made by McGee on December 7, 1987, being within one week of the day he received only a plant count from the sheriff's office. From this record, there is absolutely no basis, other than by speculation, to fix a tax on the plants because the best evidence is that the plants themselves either have no retail value, or the total chemical substance and weight was not developed by appropriate means available to the D.O.R.

The other two categories which also fit into the same class of arbitrary assessment are those dealing with hash oil and hash tar. Aside from McGee's lack of knowledge and experience, it now appears plain from the record that after further examination some of the vials of hash tar reported to the D.O.R. on December 1, 1987, were in fact empty. This fact was discovered between the date of November 18 and December 1, 1987, but was never reported to McGee by Williams. It resulted in the sheriff's department lowering its estimate of market value of the cache by over $100,000.00. Neither did McGee ever view the vials himself in making the assessment. A tax of $29,500 based on 118 ounces of so-called hash tar is clearly arbitrary and capricious when the 118 ounces does not in fact exist. Therefore, there is simply no way to compute the present value of 118 ounces of hash tar from the information supplied to the D.O.R. by the Sheriff's Office.

When Officer Williams initially reported the matter to D.O.R. on November 16, 1987, he struck out the quantity under Item 2 of "Seven gallons of hash oil." The report of December 1, which formed the basis of the assessment, reports no quantity under Item 2 and no value. The tax assessment made May 6, 1988, is based on 896 ounces of hash oil. Taking judicial notice that one gallon equals 128 ounces, it is obvious McGee used the seven gallon figure which was stricken from the report by the sheriff's office. It remains a mystery to this date as to the true quantity of alleged hash oil. This issue is more exacerbated when one considers that some of the samples taken from the gallon jugs (reported as 10 to the forensic laboratory) show no evidence of THC. Under the D.O.R. theory, such lack of chemical substance disqualifies the liquid as a controlled substance. Moreover, the record in this case conclusively shows that McGee never had any information provided to him from any source as to the market value of the hash oil. Indeed, no such evidence exists in the record. McGee failed to follow the statutory duty required of him under the Drug Tax Act, namely, to fix the tax based on the greater of a comparison between 10% of market value as opposed to a flat statutory rate. Clearly, McGee's action in failing to follow a statutory directive is arbitrary. It is noteworthy McGee recognized such legal duty because he fixed the tax on marijuana after comparing market value and the flat rate and took the greater number.

Finally, the Dangerous Drug Tax statute, in provisions pertinent to this case, provides for the taxation of hashish as

defined in 50–32–101. The terms hash oil or hash tar are not defined in either code section. The D.O.R. taxed the hash tar and hash oil as hashish. It could be argued that under § 15–25–111(2)(b)(iv), a tax of $100.00 per ounce may be levied on any substance containing or purported to contain any amount of dangerous drug not otherwise provided for in subsection (2). A substance containing THC may fit into this subparagraph but the D.O.R. did not apply such provision, and it is now bound by its tax approach. Section 50–32–101(14) defines hashish "as distinguished from marijuana, means the mechanically processed or extracted plant material that contains tetrahydrocannabinol (THC) and is composed of resin from the cannabis plant." Hashish is an extraction of the active ingredients of marijuana plants. *See, State v. Randall,* 540 S.W.2d 156, 158 (Mo.1976). The chemists from the forensic laboratory correctly stated that hash oil, a liquid substance, is undefined in the Montana law. Such is true of hash tar. However, the means used by Kurth to extract the THC substance from the marijuana plant by boiling in alcohol does fit into the hashish definition of mechanically extracting plant material that contains THC and is composed of resin. *Webster's Dictionary* (Third International 1961) defines resin as a preparation consisting chiefly as a drug extracted by solvency (as by alcohol). Consequently such substance, if properly valued or fairly reported in weight or content, could have been taxed as hashish under the Montana Dangerous Drug Tax Act. In effort to avoid Plaintiffs' contrary argument, the D.O.R. claims the Plaintiffs are estopped from asserting the liquid substances seized were not hashish as taxed, because Richard Kurth pleaded guilty under plea bargaining to possession of hashish. It is noteworthy that the Trustee is also a party Plaintiff to this action, acting on behalf of the unsecured creditors. Obviously, the Trustee is not estopped to contest the claim. Further, all other Debtors as criminal Defendants pleaded guilty to possession of marijuana, not hashish. Moreover, the better reasoned legal authorities recognize a distinction in applying the doctrine of collateral

estoppel in cases based upon trial and conviction as opposed to pleas of guilty. *Northwestern Nat. Casualty Co. v. Phalen,* 182 Mont. 448, 597 P.2d 720, 727 (1979) states:

> "Phalen's plea of guilty to felony assault is not conclusive either as to his policy coverage or the duty of Northwestern to defend him in a tort action. *Teitelbaum Furs, Inc. v. Dominion Insurance Company* (1962), 58 Cal.2d 601, 25 Cal.Rptr. 559, 375 P.2d 439, 441; *Brohawn v. Transamerica Insurance Company* (Md.1975), 276 Md. 396, 347 A.2d 842, 848."

*Teitelbaum Furs, Inc.,* relied upon by the Montana Supreme Court, states the reasoning for such rule.

> "A plea of guilty is admissible in a subsequent civil action on the independent ground that it is an admission. It would not serve the policy underlying collateral estoppel, however, to make such a plea conclusive. The rule is based upon the sound public policy of limiting litigation by preventing a party who has had one fair trial on an issue from again drawing it into controversy.' (*Bernhard v. Bank of America,* 19 Cal.2d 807, 811, 122 P.2d 892, 894.) This policy must be considered together with the policy that a party shall not be deprived of a fair adversary proceeding in which fully to present his case.' (*Jorgensen v. Jorgensen,* 32 Cal.2d 13, 18, 193 P.2d 728, 732.) When a plea of guilty has been entered in the prior action, no issues have been 'drawn into controversy' by a 'full presentation' of the case. It may reflect only a compromise or a belief that paying a fine is more advantageous than litigation. Considerations of fairness to civil litigants and regard for the expeditious administration of criminal justice (see, *Vaughn v. Jonas,* 31 Cal.2d 586, 594, 191 P.2d 432) combine to prohibit the application of collateral estoppel against a party who, having pleaded guilty to a criminal charge, seeks for the first time to litigate his cause in a civil action." *Id.* 25 Cal. Rptr. at 561, 375 P.2d at 441.

From the above authorities, the guilty plea of Richard Kurth is not binding on him, the Trustee or the other Plaintiffs. All of the Plaintiffs have the right to litigate in this civil proceeding whether hash tar or hash oil can be taxed as hashish under the Dangerous Drug Tax Act,[1] and if so by what criteria. In fact, that issue was never raised in the criminal proceedings.

The next item taxed by the D.O.R. was 100 pounds of shake at $100.00 per ounce for a total tax of $160,000.00 plus penalty, administrative fee and interest. The deputy sheriff's Drug Tax Report valued the shake at $200.00 per pound market value. At the outset, it becomes obvious that the tax assessed on this substance is 8 times its market value. McGee testified that in his 20 years of experience he has never levied a tax on property which is 8 times the market value. Plaintiff argues that because of such gross disparity to market value, the tax imposed is confiscatory, being therefore penal in nature. The Dangerous Drug Tax Act requires the tax be fixed at the greater of 10% of market value or $100.00 per ounce. Aller testified that shake has a market value in Montana at wholesale of $200.00 per pound and $250.00 to $500.00 per pound at retail. Both deputy sheriffs who participated in the arrests testified there is a market for such substance in Montana and that the shake could be upgraded by a device called a "marygin" which separates the stems and seed from the leaves. Such product would be a derivative of marijuana. Plaintiff's witness, Rosenthal, states the material was not saleable, but I reject Rosenthal's testimony on grounds that Rosenthal is not a credible witness. Rosenthal is a drug culture author who promotes the cultivation of marijuana and other controlled substances through his writings. He testified he never used marijuana, but his writings

are replete with a contrary story. His bias and prejudice in favor of drug culture related activities such as Kurth's is obvious for that is how he makes his living. I therefore disregard all of his testimony as I find he is not a credible witness.

█ The above arguments presented by the Plaintiffs also are raised as to the tax imposed on 211 ounces of marijuana found in plastic bags ready for sale by Kurths. This material was the finished product. While Plaintiffs make some argument that the weighing of each bag should have been done on an individual basis, and chemically tested, I find the deputy sheriff weighed one bag at ¼ pound and then simply multiplied the rest of the bags to arrive at the 8 pound result. The additional marijuana cache was weighed at 2230 grams. I conclude such effort was sufficient. The tax imposed by D.O.R. on such material was at $100.00 an ounce, or $1,600.00 per pound, greater than 10% of the market value of the product, which was fixed at $2,000.00 per pound. Again, in making this assessment, McGee followed the proper statutory mandate.

Plaintiffs' constitutional arguments are necessary to address as to the items of shake and marijuana because I find the evidence sufficient as to weight and quality to allow the D.O.R. to tax such items. In other words, the Drug Tax Reports, the laboratory results, and McGee's assessment of the tax on these items was not arbitrary, but was based on credible weight, chemical analysis of the product, and established market value.

█ Plaintiffs do not dispute that "the unlawfulness of an activity does not prevent its taxation." *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889, 895. The Plaintiffs contend the tax is another fine or penalty which

**1.** D.O.R. acknowledges that hash oil is defined under federal law both by the D.E.A. and under the federal criminal sentencing guidelines. 18 U.S.C.Appdx. ch. 2, § 201.1 (1989). As a result, there is a definition in existence which could be adopted by the Montana legislature. *See, U.S. v. McMahon*, 673 F.Supp. 8 (D.Me.1987) for a description of the Federal Controlled Substances Act, 21 U.S.C. 812. As stated in *U.S. v. Walton*,

514 F.2d 201, 203 (D.C.Cir.1975) and *U.S. v. Kelly*, 527 F.2d 961 (9th Cir.1976), the Federal Controlled Substances Act of 1970 defines marijuana to include those parts of marijuana which contain THC and excludes those parts which do not. The Montana statute by contrast differentiates between marijuana and hashish and fails to broadly define marijuana as does the federal act.

follows arrest and therefore, runs afoul of the double jeopardy and due process clauses of the U.S. Constitution. Plaintiffs rely principally on *U.S. v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).[2] A number of lower court decisions discussing or applying *Halper* have been cited by both parties. *See, U.S. v. Hall,* 730 F.Supp. 646 (M.D.Pa.1990); *U.S. v. Pani,* 717 F.Supp. 1013 (S.D.N.Y.1989); *U.S. v. A Parcel of Land with Bldg. L. Thereon,* 884 F.2d 41 (1st Cir.1989); *U.S. v. Marcus Schloss & Co., Inc.,* 724 F.Supp. 1123 (S.D.N.Y.1989) (Dicta); *U.S. ex. rel. McCoy v. Med. Review, Inc.,* 723 F.Supp. 1363 (N.D.Cal.1989); *U.S. v. U.S. Fishing Vessel Maylin,* 725 F.Supp. 1222 (S.D.Fla.1989); *Kvitka v. Board of Registration in Medicine,* 551 N.E.2d 915, 407 Mass. 140 (1990); and *Randall Book Corp. v. State,* 316 Md. 315, 558 A.2d 715 (1989). Some of the federal cases involved forfeiture statutes against real and personal property and distinguish *Halper* on that ground. Other cases are factually inapplicable or contain dicta.

■ The Double Jeopardy Clause of the Fifth Amendment protects against three abuses; (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The third of these protections is the one which Plaintiffs claim the D.O.R. has violated by making a substantial tax assessment when Plaintiff/Debtors were convicted of the crime on which the tax is based.

Basically, Plaintiffs argue that the imposition of this penalty, although done pursuant to a "civil" procedure, is in reality a further punishment for the criminal conduct to which each Debtor pled guilty. In making its argument, Plaintiffs rely on the

recent decision of the United States Supreme Court in *United States v. Halper,* supra.

In *Halper,* the Court considered the question of "whether and under what circumstances a civil penalty may constitute punishment for purposes of the Double Jeopardy Clause." *Id.* 490 U.S. at 446, 109 S.Ct. at 1901. A unanimous court held that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can be explained only as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Id.* 490 U.S. at 448, 109 S.Ct. at 1902. The Double Jeopardy Clause, the court went on to hold, prohibits the imposition of such a civil sanction "to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." *Id.* It is implicated when "the sanction [is] overwhelmingly disproportionate to the damages [defendant] has caused." *Id.*

In determining the purpose behind a civil sanction, the Court must look at more than just the language of the statute itself. As the *Halper* court stated:

"... [W]hile recourse to a statutory language, structure and intent is appropriate in identifying the inherent nature of a proceeding, or in determining the constitutional safeguards that must accompany those proceedings as a general matter, the approach is not will suited to the context of the 'humane interest' safeguarded by the Double Jeopardy Clause's proscription of multiple punishments. This constitutional protection is intrinsically personal. Its violation can be identified only by assessing the character of the actual sanctions imposed on the individual by the machinery of the state." *Id.* 490 U.S. at 447, 109 S.Ct. at 1901 (citation omitted).

---

2. In the Pre-Trial Order, the Plaintiff specifically raised as a contention that the Drug Tax places Plaintiff twice in jeopardy. Under "Law Problems" it is stated, "If the court wishes to analyze this case under *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), a separate factual inquiry will be needed, witnesses will need to be called and evidence

presented far differently from that set forth in this order." The evidence should have been presented as the matter was an issue noted in the Pre-trial Order. Neither party prior to or during trial moved to bifurcate the issue and all parties had notice of the contentions as is further discussed in this decision.

Thus, the labels of "civil" and "criminal" are not of paramount importance in making this determination. *See, id.* A civil sanction constitutes punishment when the sanction as applied in the individual case serves the goal of punishment. *Id.* 490 U.S. at 448, 109 S.Ct. at 1901–1902.

In *Halper*, the Court restated its time-honored recognition of the fact "that in the ordinary case fixed-penalty-plus-double-damages provisions can be said to do no more than make the Government whole." *Halper*, 490 U.S. at 449, 109 S.Ct. at 1902. The only proscription established by the Court in *Halper* is that "the Government may not bring a separate civil action based on the same conduct and receive a judgment that is not rationally related to the goal of making the Government whole." *Id.* 490 U.S. at 451, 109 S.Ct. at 1903. It is this second proceeding that triggers the protections of the Double Jeopardy Clause. *See, Id.*, n. 10.

D.O.R.'s answer to the double jeopardy argument is that (1) the state has broad latitude in creating tax classifications and drawing lines which, in its judgment produce reasonable systems of taxation, *Kahn v. Shevin*, 416 U.S. 351, 355, 94 S.Ct. 1734, 1737, 40 L.Ed.2d 189 (1974); *Regan v. Taxation with Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129; (2) that states may tax income from illegal activity even though such income may be forfeited, *James v. U.S.*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); and (3) the Montana Dangerous Drug Tax Act is not punitive since it does not require a finding of scienter, *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–169, 83 S.Ct. 554, 567–568, 9 L.Ed.2d 644 (1963), but is simply an excise tax designed to partially compensate Montana for costs of rehabilitating drug users. D.O.R. cites the provision of the Act wherein the tax proceeds are to be used for youth evaluation and chemical abuse aftercare programs, for grants to youth courts to fund assessments and independent juvenile offender facilities, and to fund drug law enforcement and education on a local level. According to D.O.R. "the tax is designed to

recover some of the millions of dollars Montana spends each year because of illicit drugs,"[3] so the tax is to cover societal costs, and is therefore not punitive or penal in nature. This latter statement of D.O.R. is mere hyperbole, since the D.O.R. failed to introduce one scintilla of evidence as to cost of the above government programs or costs of law enforcement incurred to combat illegal drug activity. Moreover, Deputy Sheriff Saville was specifically asked by Plaintiffs' counsel if the witness had made *any* (even a rough) estimate as to the cost to the state on prosecution of the Kurth criminal investigations, arrest and conviction and he replied none was made. Consequently, the D.O.R., faced with the *Halper*, issue, which was raised at the Motion for Summary Judgment stage, put forth no effort at the trial stage, when it had an opportunity to do so, to show the tax is "rationally related to the goal of making the government whole." *Halper, Id.* 490 U.S. at 451, 109 S.Ct. at 1903. I have no doubt such evidence may be available, but it simply was not produced in this case.

It is difficult for this Court to rationalize such neglect of the issue when D.O.R. stated in the Brief in Opposition to Plaintiffs' Motion for Summary Judgment (incorporated by reference in its Post–Trial Brief) at page 17 as follows:

"Even assuming the Drug Tax is subject to analysis under the *Halper* criteria, that case does not permit summary judgment based on the record now before this Court. *Halper* requires a particularized inquiry. As Justice Kennedy stated in his concurring opinion:

'Today's holding, I would stress, constitutes an objective rule that is grounded in the nature of the sanction and the facts of the particular case. It does not authorize courts to undertake a broad inquiry into the subjective purposes that may be thought to lie behind a given judicial proceeding. (Citations omitted.) Such an inquiry would be amorphous and speculative, and would mire the courts in the quagmire of differentiating among the multiple

---

**3.** Brief of D.O.R. in opposition to Plaintiffs' Motion for Summary Judgment, p. 16.

purposes that underlie every proceeding, whether it be civil or criminal in nature.'

\*     \*     \*     \*     \*     \*

In *Halper* the case was remanded back to the District Court for a hearing the damage (sic) suffered by the Government. *Halper* did not exclude an inquiry into the social damages of the taxed activity. There simply is no record for the court to apply the *Halper* criteria to this case."

In denying Plaintiffs' Motion for Summary Judgment, this Court based its denial on the reasoning that numerous factual issues were in dispute or not in the record. Only a trial could cure those deficiencies. The present record, after trial, is still woefully deficient.

D.O.R. further argues that *United States v. Sanchez*, 340 U.S. 42, 71 S.Ct. 108, 95 L.Ed. 47 (1950) is the case in point as to double jeopardy issue. *Sanchez* challenged a federal tax of $100.00 per ounce or fraction thereof on marijuana assessed under 26 U.S.C. § 2590(a)(2), which statute was later held unconstitutional in *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) on grounds it violated the Fifth Amendment against self-incrimination. *Sanchez* was a tax case, and did involve a criminal action. In deciding the marijuana tax statute was valid, the Court noted that a tax does not cease being valid merely because it regulates, discourages or even definitely deters the activities taxed. *Id.* 340 U.S. at 44, 71 S.Ct. at 110. *Sanchez* is inappropriately cited by the D.O.R. as decisive of the double jeopardy issue. No such issue was present in *Sanchez*, namely, a multiple-punishment inquiry. *Halper* answers that merely because Congress or a state provides for a civil remedy this,

" \* \* \* does not foreclose the possibility that in a particular case a civil penalty authorized by the Act may be so extreme and so divorced from the Government's damages and expenses as to constitute punishment." *Id.* 490 U.S. at 442, 109 S.Ct. at 1898.

And since retribution and deterrence are the aims of punishment, and not "legitimate nonpunitive governmental objectives,"

" \* \* \*, it follows that a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can be explained only as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Halper*, 490 U.S. at 448, 109 S.Ct. at 1902.

The tax which I have found to be legally imposed pursuant to Drug Tax Statute on the possession of marijuana exceeds $208,-150.00 (without interest). If D.O.R. were allowed to impose this tax, without any showing of some rough approximation of its actual damages and costs which it seeks to recover to make the State whole, I would, as noted in *U.S. v. Hall*, supra, at 674, "be sanctioning the very type of 'clear injustice' which *Halper* prohibits," for, on such state of this record, the tax is punishing the Debtors twice for the same criminal conduct. I find further support for this holding that the tax is penal in nature when one considers, as noted early in this decision, that the tax imposed on the 100 pounds of shake, pursuant to the statute, results in a tax which is 8 times the acknowledged market value of the product.

Moreover, courts have recognized that drug tax statutes, like Montana's, are essentially penal in nature and assist in the enforcement of the state's criminal laws. *See, e.g., State of Kansas v. Durrant*, 244 Kan. 522, 769 P.2d 1174, 1181 (1989) (" \* \* \*, the state concedes in its brief that the primary purpose of K.S.A. 198 Supp. 79–5021 *et seq.* is to discourage or eliminate drug dealing"). *See also, Tovar v. Jarecki*, 173 F.2d 449 (7th Cir.1949). Such inquiry is warranted in view of the admonition of the concurring opinion for Justice Kennedy, noted above, in applying the objective tests of *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–169, 83 S.Ct. 554, 567–568, 9 L.Ed.2d 644 (1963). The punitive nature of the tax is evident here, because drug tax laws have historically been regarded as penal in nature, the Montana Act promotes the traditional aims of punish-

ment—retribution and deterrence, the tax applies to behavior which is already a crime, the tax allows for sanctions by restraint of Debtors' property, the tax requires a finding of illegal possession of dangerous drugs and therefore a finding of *scienter*, the tax will promote elimination of illegal drug possession, and the tax appears excessive in relation to the alternate purpose assigned, especially in the absence of any record developed by the State as to societal costs. Finally, the tax follows arrest for possession of illegal drugs and the tax report is made by law enforcement officers, not the taxpayer, who may or may not sign the report. All these aspects of the Drug Tax Act lead to the inescapable conclusion that it has deterrence and punishment as its purpose.

 I reject Plaintiffs' alternative constitutional arguments dealing with excessive fines under the Eighth Amendment because the tax is not a fine in a criminal proceeding, *U.S. v. Sanchez*, 340 U.S. 42, 45, 71 S.Ct. 108, 110, 95 L.Ed. 47 (1950), nor does it offend the due process or equal protection clauses in this tax case. *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1980) (due process is not offended if party contesting the tax is afforded an opportunity to challenge the tax before conclusive judgment); *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985); and *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) (State may impose different specific taxes upon different trades and professions and vary the rates). All drug dealers are treated equally under the Drug Tax Act, and such is a reasonable classification. Further, there is no unconstitutional delegation of legislative powers to the D.O.R. to make a determination of market value. *Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283 (9th Cir.1979); *Patterson v. Department of Revenue*, 171 Mont. 168, 557 P.2d 798 (1976). I finally reject Plaintiffs' arguments made under Article II, § 28 of the Montana Constitution and eminent domain as spurious.

In conclusion, I find and hold the Jeopardy Tax Assessments issued December 7, 1989, and May 6, 1988, are arbitrary and capricious as to the tax imposed on marijuana plants, hash oil and hash tar, and were made contrary to the provisions of the Drug Tax Act. I further conclude that if the tax on such products were rightfully imposed pursuant to the statute, each assessment, including that assessment for 1811 ounces of marijuana, constitutes double jeopardy to the Debtors, prohibited by the Fifth Amendment to the U.S. Constitution, pursuant to *U.S. v. Halper*, supra.

IT IS ORDERED the Plaintiffs' Objections to the Amended Proof of Claim filed by the Montana Department of Revenue in the sum of $864,940.99 pursuant to the Montana Dangerous Drug Act, Section 15–25–101–123, Mont.Code Ann. (1987) are granted and the Proof of Claim is denied.

IT IS FURTHER ORDERED that all sums recovered by the Defendant from the Plaintiff pursuant to the double jeopardy tax assessment shall be forthwith remitted to the Trustee, Robert G. Drummond.